## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Kyle Chrupcala, as the representative of a class of similarly situated persons, and on behalf of the Firstrust 401(k) and Profit Sharing Plan,<br><br>        Plaintiff,<br><br>   v.<br><br>Firstrust Savings Bank,<br><br>        Defendant. | Case No.<br><br><br><br>**COMPLAINT – CLASS ACTION** |

## INTRODUCTION

1.      Kyle Chrupcala ("Plaintiff"), as the representative of the Class described herein, and on behalf of the Firstrust 401(k) and Profit Sharing Plan (the "Plan"), brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Firstrust Savings Bank ("Defendant"). This case is about Defendant's failure to monitor the investment of employer contributions to Plan participant accounts and to invest those assets prudently and for the exclusive benefit of Plan participants.

2.      Defendant does not allow participants to direct the investment of employer contributions to their accounts. Instead, Defendant controls the investment of employer contributions. Defendant directed 100% of funds under its control to proprietary certificates of deposit and savings accounts (together the "Firstrust Cash Fund"), resulting in the Firstrust Cash Fund serving as the Plan's single largest holding. Defendant's decision to allocate employer contributions solely to the Firstrust Cash Fund caused Firstrust employees to earn millions less in income and gains than participants would have earned in a prudently invested portfolio appropriately tailored the objectives of the Plan.

3.      Defendant violated ERISA, 29 U.S.C. §§ 1104(a)(1) and 1106(a), by directing millions of dollars of Plan assets into Firstrust's proprietary bank accounts without giving appropriate consideration to the objectives of the Plan or Plan participants' investment time horizons and needs, resulting in losses to the Plan recoverable pursuant to 29 U.S.C. §§ 1109 and 1132(a). Plaintiff brings this case on behalf of the Plan and its participants to recover lost earnings and appropriate equitable relief.

## PARTIES

### The Firstrust 401(k) and Profit Sharing Plan

4.      Firstrust established the Plan in 1951 to provide retirement benefits to employees.

1

5.      The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A); a "defined contribution plan" as defined by 29 U.S.C. § 1002(34) (also known as an "individual account plan"); and a tax-deferred retirement savings plan for purposes of the Internal Revenue Code, 26 U.S.C. § 401(k).

6.      As a defined contribution plan, the Plan maintains an individual account for each participant. Each participant's account is credited with their elective contributions and a *pro rata* share of contributions from Firstrust ("employer contributions"). Participants further receive all income and gains from directing the investment of their elective contributions and a *pro rata* share of investment income and gains from Defendant's investment of the employer contributions.

7.      Participants rely solely on Defendant to invest employer contributions. In this regard, the Plan is not typical. Most defined contribution plans allow each participant to choose their own investments for both employer and employee contributions from a menu of funds managed by professional asset managers.

8.      Plan benefits are limited to the value of participants' individual accounts. Each participant's benefit is equal to the value of their individual account at the time that it is distributed.

9.      The Plan has approximately $83.4 million in assets and around 600 participants.

***Plaintiff***

10.     Plaintiff Kyle Chrupcala worked for Firstrust between 2021 and 2024 and participated in the Plan. He received a distribution of his Plan account balance in 2024. At the time that it was distributed, his account balance included employer contributions. The benefit that Plaintiff received from the Plan would have been greater if Defendant invested the employer contributions prudently and solely in the interest of participants.

***Defendant***

11.    Defendant is a bank organized in Pennsylvania with branches in Pennsylvania, New Jersey, and Maryland. Defendant is the sponsor and administrator of the Plan pursuant to 29 U.S.C. § 1002(16). Defendant directs how employer contributions are invested in the Plan. Accordingly, Defendant is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i) and (iii). Defendant is also a "party in interest" to the Plan as defined by 29 U.S.C. § 1002(14)(A) and (C) because it is the administrator of the Plan and its employees are participants in the Plan.

## JURISDICTION AND VENUE

12.    Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

13.    This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.    Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendant's violations of ERISA occurred in this district where the Plan is administered and Firstrust is headquartered.

## DEFENDANT'S IMPRUDENT AND DISLOYAL INVESTMENT PROCESS

### *The Prudent Investor Rule*

15.    ERISA fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *See In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996) (ERISA prudence is measured consistent with common law trust principles); *Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) (the "common law 'prudent investor' rule [was] codified by ERISA.").

3

16.    The prudent investor rule is based on modern portfolio theory. *See In re Unisys Sav. Plan Litig.*, No. 91-3067, 1997 WL 732473, at *30 (E.D. Pa. Nov. 24, 1997) ("ERISA also sanctioned . . . the modern portfolio [theory] view in which investors are encouraged to consider total return and total portfolio performance in governing pension plans.") (citing Robert J. Aalberts & Percy S. Poon, *The New Prudent Investor Rule and the Modern Portfolio Theory: A New Direction for Fiduciaries*, 34 Am. Bus. L.J. 39, 46 (1996)); *id*. ("Indeed, the *Restatement (Third) of Trusts* similarly embraces the [modern] portfolio theory and incorporates it into the modern standard for determining whether a fiduciary beach has occurred").

17.    Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed . . . to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain[.]" 29 C.F.R. § 2550-404a-1(b)(2)(i); *see also* Restatement (Third) of Trusts § 90 (2007) (fiduciaries must pursue "an overall investment strategy[] which . . . incorporate[s] risk and return objectives reasonably suitable to the trust.").

18.    The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* Restatement (Third) of Trusts § 90 (2007) cmts. a & k (the prudent investor rule is "an extension and clarification of the traditional . . . 'prudent man rule'" pursuant to which "[b]road categories and techniques came to be . . . classified as 'impermissible.'"); *see also id.*, Reporter's Note to cmt. e. ("'safety' of the funds invested was often identified as 'the primary object to be obtained by a trustee' under traditional doctrine'").

19.    Rather than avoid risk, fiduciaries must *manage* risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach & Robert H. Sitkoff, *The Prudent Investor Rule and Market*

*Risk: An Empirical Analysis*, 14 EMPIRICAL LEGAL STUD. 129, 130 (Mar. 2017) ("The prudent investor rule . . . reorients trust investment from risk avoidance to risk management[.].").[1]

20.    A plan's risk tolerance "largely depends" on how long funds will be held. Restatement (Third) of Trusts § 90 (2007) cmt. e(1). The longer funds are expected to be held, the greater the investor's tolerance for short-term risks associated with market volatility. *See* CFA Institute, *Investment Risk Profiling: A Guide for Financial Advisors*, 6-7 (2020) ("All else being equal, investors with long goal time horizons have a greater capacity to withstand and recoup portfolio losses resulting from market volatility, compared with investors with shorter goal time horizons.").[2]

21.    The prudent investor rule prohibits fiduciaries from considering interests other than the interests of beneficiaries. Restatement (Third) of Trusts § 90 (2007) cmt. c (stating that the duty of loyalty "prohibit[s] . . . investing in a manner that is intended to serve interests other than those of the beneficiaries"); 29 U.S.C. § 1104(a)(1)(A) (fiduciaries must act for the "exclusive benefit" of plan participants).

22.    A fiduciary must not "sacrifice investment return" to serve their own interests. 29 C.F.R. § 2550.404a-1(c)(1); *see also Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995) (fiduciaries violate their duty of loyalty "when they act in the interests of the plan sponsor rather than 'with an eye single to the interests of the participants and beneficiaries of the plan.'") (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). ERISA "necessitates that a fiduciary refrain from placing himself in a position where his personal interests may conflict with the interests of his beneficiaries." *Perez v. Koresko*, 86 F. Supp. 3d 293, 384 (E.D. Pa. 2015) (citing *Solis v. Koresko*, 884 F. Supp. 2d 261, 294 (E.D. Pa. 2012)).

---

[1] *Available at* www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.
[2] *Available at* https://rpc.cfainstitute.org/research/reports/investment-risk-profiling.

23.     While "there are endless variations in reasonable strategies for investing[,]" a fiduciary's investment approach "must be reasonably supported in concept and must be implemented with proper care, skill, and caution." Restatement (Third) of Trusts § 90 (2007) cmts. f & h.

24.     Whether a fiduciary satisfied its duty is a test of conduct and process. *Id.* cmt. (e)(1) ("The test of prudence is one of conduct, not one of performance."). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field. It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 183 (3d Cir. 2024) (quoting *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 329 (3d Cir. 2019)). Courts consider whether "a fiduciary employed the appropriate method to investigate and determine the merits of a particular investment." *Sweda*, 923 F.3d at 329 (quoting *In re Unisys Sav. Plan Litigation*, 74 F.3d at 434).

25.     ERISA's fiduciary duties apply in full force to all plan assets, whether employer or employee contributions. *Sec'y of Lab. v. Doyle*, 675 F.3d 187, 203 (3d Cir. 2012) ("[T]he term 'plan assets' should be given its ordinary meaning, and therefore be construed to refer to property owned by an ERISA plan."); *see also Hammer v. Johnson Senior Ctr., Inc.*, No. 6:19-CV-00027, 2020 WL 7029160, at *9 (W.D. Va. Nov. 30, 2020) (employer contributions are plan assets once paid to the plan).

### The Plan's Investment Objective and Tolerance for Risk

26.     The Plan is an employee retirement plan.

27.     Employee retirement plans are generally long-term investments. *See* Default Investment Alternatives Under Participant Directed Individual Account Plans, 72 FR 60452,

60463, 72 FR 60452-01, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments").

28.    The average U.S. worker at any given time is over 20 years or more from retirement age. *See* U.S. Bureau of Labor Statistics, "Employment Projections: Median age of the labor force, by sex, race and ethnicity."[3]

29.    The average U.S. worker is unprepared for retirement. *See* Statement of Dan Doonan, Executive Director, National Institute on Retirement Security, to the Senate Committee on Health, Education, Labor, and Pensions, 118 Cong. (2024), 3 (Feb. 28, 2024) ("The data indicate that most Americans, particularly middle-class workers, are falling far short when it comes to saving enough money for a financially secure retirement.").[4]

30.    Plan participants suffer an extra 10% penalty tax to use their accounts before retirement age, in addition to having the entire withdrawal taxed as income. *See* 26 U.S.C. § 72(t). Plan participants are further encouraged to hold their Plan accounts until retirement by deferral of tax on account contributions and investment earnings. *See* 26 U.S.C. § 501(a).[5]

31.    On information and belief, the average Firstrust employee is similar to the average U.S. worker in terms of years from retirement and lack of retirement readiness. Most Firstrust employees work because they need income to support themselves and their families. They do not independently have sufficient assets to support themselves through retirement.

---

[3] *Available at* https://www.bls.gov/emp/tables/median-age-labor-force.htm.
[4] *Available at* https://www.nirsonline.org/wp-content/uploads/2024/02/FINAL-Senate-Written-Testimony-Feb-2024.pdf.
[5] That some employees will leave Firstrust before retirement and withdraw their accounts from the Plan does not change their investment horizon. The Plan must allow workers to transfer their accounts to other tax qualified retirement plans to avoid the penalty tax. *See* 26 U.S.C. §§ 401(a)(31), 402(c). While assets cannot be transferred in kind, participants will generally be able to transfer their assets into another qualified retirement plan and elect investments appropriate for their retirement needs. Distribution from the Plan is not typically the end of a participant's investment horizon.

32.    As of 2023, the average Firstrust Plan account balance was under $120,000. This is insufficient for retirement. *See* PwC, "Retirement in America: Time to rethink and retool," at 4 (2021) (finding $120,000 is "hardly enough even without factoring in rising life expectancies and increasing health care costs.").[6] Firstrust does not offer its employees a defined benefit plan or a supplemental defined contribution plan. The Plan is the only retirement benefit offered to Firstrust employees.

33.    Based on the foregoing, like most retirement plan participants, Plan participants have a long investment horizon and need their account values to grow in order to generate sufficient retirement income. They have a high tolerance for the risk associated with short-term market volatility. A prudent fiduciary would manage the Plan's investments in a manner that ensures that participants have sufficient opportunity for capital appreciation.

### *Risk and Return Characteristic of Major Asset Classes*

34.    In order to maintain investments that are suited to participants' investment objectives and risk tolerances, a prudent fiduciary must understand the risk and return characteristics of different asset classes.

35.    Stocks generate the highest long-term average returns, although they exhibit the highest short-term volatility. *See* Restatement (Third) of Trusts § 90 (2007) cmt. l ("Historically, corporate stocks have provided greater total return over the long term than bonds but ordinarily entail higher risks[.]").

36.    Cash-equivalent accounts like the Firstrust Cash Fund generate the lowest long-term average returns, but they reduce volatility risk to close to zero. *See id.* ("Returns from these investments have traditionally been relatively low, but their convenience, liquidity, and safety …

---

[6] *Available at* https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.

are especially useful in making modest amounts of trust funds productive for limited periods of time."). Cash-equivalents are appropriate only if the investor has a short-term investment objective, needs to preserve their principal balance, and cannot tolerate market risk. These investments are not designed or expected to provide competitive long-term growth needed by retirement plan participants such as Plaintiff and the Class.

37.     Other assets typically fall in the middle, with the general rule being that bonds of longer duration or lower credit quality will produce higher long-term returns (albeit with higher risk) than bonds of shorter duration or higher credit equality. *See id*.

38.     Real estate generates returns close to stocks and offers potential inflation protection and reduced volatility relative to stocks. *See id.* cmt. o.

39.     A prudent fiduciary would have understood these characteristics, which have held true for more than a century. A recent study found that for 140 years, over any given 10-year period, more volatile investments in stock and real estate consistently compensated long-term investors with higher returns.[7] *See* Òscar Jordà *et al*., *The Rate of Return on Everything, 1870-2015*, 134 Q.J. ECON. 1225, 1241-45, 1284-85 (2019).

### *Defendant's Investment of Employer Contributions*

40.     Defendant elects to hold 100% of the Plan's employer contribution assets in the Firstrust Cash Fund, wholly comprised of the bank's own certificates of deposit and savings accounts. This practice is ongoing, with each purchase of a new certificate of deposit (they have terms of under a year) and each employer contribution (likely biweekly) deposited in a bank savings account.

---

[7] The one exception appears to have been looking back 10 years from the middle of the Great Depression. *See id.* at 1285. Every other rolling 10-year period over 140 years saw a payoff for growth-oriented investments in stocks and real estate. *See id.*

41.     A certificate of deposit "is a type of savings account that pays a fixed interest rate on money held for an agreed-upon period."[8] Savings accounts are accounts held by a bank that "typically pay a modest interest rate" and "are considered safe for parking cash that you want available for short-term needs."[9]

42.     Accordingly, cash-equivalent accounts like the Firstrust Cash Fund sit at the low end of the risk-return spectrum and are designed for short-term holdings. A prudent fiduciary would have understood at all times that funds invested in cash-equivalents for long periods will earn less than investment in stocks, real estate, high yield bonds, or longer duration bonds. Yet Defendant has steadfastly invested the Plan's employer contributions solely in the Firstrust Cash Fund since at least 2009.

43.     During the statutory period of six years prior to the filing of this action,[10] Defendant invested employer contributions in certificates of deposits through the Firstrust Cash Fund paying as little as 0.10% in interest. From 2020 through 2024, the certificates of deposit (CDs) within the Firstrust Cash Fund paid an asset-weighted average of 2.81% in interest per year. Defendant invested the remainder of the Firstrust Cash Fund in savings accounts. These accounts yielded even less interest than the CDs. In aggregate, the Firstrust Cash Fund yielded only 2.27% per year between 2020 and 2024.

44.     Defendant's retention of employer contributions solely in cash-equivalents exposed participants to excessive inflation risk. The fact that such investments are likely to result in a loss of real buying power when held for long periods of time is recognized by the prudent investor rule

[8] *What is a Certificate of Deposit (CD)? Pros and Cons*, INVESTOPEDIA, *available at* https://www.investopedia.com/terms/c/certificateofdeposit.asp.
[9] *What is a Savings Account and How Does it Work?*, INVESTOPEDIA, *available at* https://www.investopedia.com/terms/s/savingsaccount.asp.
[10] 29 U.S.C. § 1113.

and backed up by long-term data. Recent trends around the start of the statutory period also signaled that holding cash-equivalents for an extended period was likely to result in a loss of real buying power. In the 10 years after the Great Recession, from 2009 to 2018, CDs averaged roughly 0.79%[11] while inflation averaged 1.55%.[12] A prudent fiduciary in Defendant's position would have foreseen that continuing to hold all employer contributions in cash-equivalents would result in a loss of real buying power for participants.

45.    In fact, Defendant's strategy failed to keep pace with inflation. Defendant's annual average earnings rate on employer contributions of 2.27% from 2020 to 2024 was substantially outpaced by inflation at an average of 4.2% per year over the same period.[13]

46.    "An objectively reasonable prudent person would seek to obtain a return on the investment beyond merely keeping pace with inflation, even if doing so entailed some degree of risk." *Hardy v. United States*, 138 Fed. Cl. 344, 354 (2018). After all, participants are only "entitled to whatever assets are dedicated to [their] account." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999).

47.    By locking employer contributions into the Firstrust Cash Fund, Defendant has ensured that a meaningful portion of participants' Plan accounts are destined to lose, and indeed have lost, real value over time.

### *Imprudent Asset Allocation*

48.    Defendant's strategy caused the overall mix of investments in participants' portfolios to be far outside the norm for defined contribution plan participants.

---

[11] Karen Bennett, *Historical CD Interest Rates: 1984-2025*, BANKRATE, (June 6, 2025), https://www.bankrate.com/banking/cds/historical-cd-interest-rates/. Average is determined by taking the year-end rates for 1- and 5-year CDs, averaging each of those values, and then determining the average of those averages.
[12] *Consumer Price Index, 1913-*, FED. RESERVE BANK OF MINNEAPOLIS, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913-.
[13] *Consumer Price Index, 1913-*, FED. RESERVE BANK OF MINNEAPOLIS, https://www.minneapolisfed.org/about-us/monetary-policy/inflation-calculator/consumer-price-index-1913-.

49.    Target date funds provide a benchmark for what constitutes a typical asset mix appropriately tailored to participants' objectives. That is because nearly all defined contribution plans offer target date funds, and target date funds are designed by professional asset managers to be used by defined contribution plan participants as a total portfolio solution. Target date funds also demonstrate the effect of age on proper asset allocation strategy, as target date series are offered in multiple age bands appropriate for employees at different stages of their careers.

50.    Importantly, target-date funds are intended to serve as an "all-in-one" holding for retirement plan participants, as on a stand-alone basis they fully incorporate the risk-return tradeoff appropriate for a participant based upon their anticipated retirement date. *See* Caroline Banton, *Target-Date Funds: Advantages and Disadvantages*, INVESTOPEDIA (Dec. 31, 2021), https://www.investopedia.com/articles/retirement/07/life_cycle.asp ("Target retirement funds are designed to be the only investment vehicle that an investor uses to save for retirement.").

51.    The Callan Target Date Index is a composite of 64 target date fund series that measures the consensus among professional asset managers of the proper allocation to various asset classes for retirement plan participants. The Callan Target Date Index reveals that cash-equivalents represent between 1% and 7% of the consensus participant portfolio, depending on age.[14]

52.    Defendant's own target date offering to Plan participants for their elective contributions, the T. Rowe Price target date series, is similar to the consensus. The T. Rowe Price target date funds hold between 2.44% and 7.26% of their assets in cash-equivalents, depending on the targeted age band of participants.

---

[14] *Callan Target Date Index*, CALLAN INSTITUTE, https://www.callan.com/target-date-index/.

53.     The aggregate holdings of 401(k) plans also provide a benchmark for the role that cash-equivalents play in a typical defined contribution plan investment strategy. Among all 401(k) plans with between $10 million and $100 million in assets, only 1.5% of total plan assets are invested in cash-equivalents.[15]

54.     The Plan is an extreme outlier due to Defendant's decision to restrict employer contributions to the Firstrust Cash Fund. Since the end of 2019, between 25% and 34% of the Plan's total assets have been invested in the Firstrust Cash Fund.

| Year | Firstrust Cash Fund | Total Plan Assets | Firstrust Cash Fund as % of Total Plan Assets[16] |
|------|---------------------|-------------------|---------------------------------------------------|
| 2019 | $15,472,913 | $49,786,002 | 31.08% |
| 2020 | $18,039,530 | $60,517,610 | 29.81% |
| 2021 | $19,114,614 | $68,817,990 | 27.78% |
| 2022 | $20,239,178 | $59,680,532 | 33.91% |
| 2023 | $21,222,235 | $71,418,207 | 29.72% |
| 2024 | $21,457,168 | $83,432,754 | 25.72% |

55.     Defendant's strategy of sidelining one-quarter to one-third of the Plan in the Firstrust Cash Fund with negative real returns ensures that Plan participants have less opportunity for growth than is typical and prudent for 401(k) plan participants. A prudent fiduciary would manage the Plan's employer contributions in a manner that ensures participants have sufficient opportunity for capital appreciation, rather than sacrificing gains for extra volatility protection that does not comport with the Plan's goals.

56.     That Plan participants may direct the investment of employee contributions does not absolve Defendant of its fiduciary breaches. *Hughes v. Northwestern Univ.*, 595 U.S. 170, 176 (2022) ("participants' ultimate choice over their investments" does not "excuse allegedly

---

[15] The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2022, BRIGHTSCOPE AND THE INVESTMENT COMPANY INSTITUTE 37 (Mar. 2025), https://www.ici.org/system/files/2025-03/25-rpt-dcplan-profile22-401k.pdf.

[16] The decreasing Firstrust Cash Fund as % of Total Plan Assets is the result of increasing assets in the participant-directed portion of the Plan and not Defendant's decision to reduce assets in the Firstrust Cash Fund.

imprudent decisions by [Defendant].”). For example, even if Plan participants were to invest 100% of their employee contribution assets into equity mutual funds to obtain capital appreciation, their accounts would still hold between 25% and 34% in cash. *Supra* ¶ 54~5~4. That is, Defendant's restriction of employer contributions to the Firstrust Cash Fund makes it impossible for Plan participants' accounts to achieve the prudent asset allocations set forth in the Plan's T. Rowe Price target-date funds—the qualified designated investment alternative for employee contributions. *Supra* ¶ 52~5~2.

57.    Further, substantial holdings in cash or cash-equivalents are not a substitute for fixed income securities held as part of a prudent asset allocation for retirement plan participants. Since 1960, “cash has barely kept up with inflation, a fact that would seem to create a significant hurdle to including cash as part of a strategic asset allocation.” Roger A. Aliaga-Diaz, Ph.D. et al., *A Framework for Allocating to Cash: Risk, Horizon, and Funding Level*, Vanguard Research (Apr. 2024), https://tinyurl.com/mvy3yucy (“*A Framework for Allocating to Cash*”). This is reflected in the minimal cash holdings in Defendant's chosen T. Rowe Price target-date series, the consensus asset allocation within the Callan Target Date Index, and the aggregate holdings of 401(k) plans. *Supra* ¶¶ 51~5~1–53~5~3.

58.    Nor would the suggestion that the Plan's substantial Firstrust Cash Holding serves as a “safe haven” for participants meet ERISA's prudence requirements. “While cash may appear to be a secure investment, maintaining an excess of cash and/or attempting to time the market can have a detrimental and permanent impact on an investor's financial outcomes.” *A Framework for Allocating to Cash*. Indeed, “[s]taying invested through volatile times is one of the key investment principles for success identified by Vanguard research.” *Id*.

59.     By retaining approximately one-quarter to one-third of Plan assets to the Firstrust Cash Fund, Defendant breached its duty of prudence. Defendant breached its duty to monitor by retaining assets in the Firstrust Cash Fund in the face of established investment principles regarding cash holdings in retirement investments, evidence that this allocation was continuing to fail to generate growth for the benefit of Plan participants, and participant data showing Plan participants did not have sufficient assets saved for retirement.

### *Disloyal Asset Allocation*

60.     The Plan's Firstrust Cash Fund is comprised solely of Firstrust's own savings account and certificates of deposit.

61.     Firstrust, as a bank, earns profits by lending funds to borrowers at a higher interest rate than what is paid to the bank's depositors. However, banks are obligated to pay depositors' funds whenever those funds are withdrawn, creating a risk that many depositors may withdraw their funds simultaneously. To help mitigate this risk, banks offer certificates of deposits because they are held for a defined period and thus provide certainty as to their withdrawal timing.

62.     By depositing employer contributions into certificates of deposits through the Firstrust Cash Fund, Defendant reduces the bank's withdrawal risks while simultaneously profiting from Plan participants' retirement assets. Because these assets are held in a 401(k) plan and under Defendant's control, Defendant's business risks are further mitigated and profits further increased due to Defendant's ability to continuously reinvest participants' assets in new certificates of deposit once they mature.

63.     While savings accounts do not have defined maturities like certificates of deposits, the Federal Reserve Board, through Federal Regulation D, limits the number of withdrawals that

can be made from a savings account.[17] The limitation on withdrawals is further emphasized by virtue of the savings account assets within the Firstrust Cash Fund being held in a 401(k) plan and under Defendant's control. As a result, like certificates of deposits, depositing the Plan's employer contributions into the bank's savings account reduces the bank's withdrawal risks.

64.     The retention of employer contributions in the proprietary Firstrust Cash Fund generates meaningful profits for Defendant. A bank's profit on CDs and savings accounts is generally the earnings the bank generates on the investments it makes with those assets, minus the interest the bank is paying to the customer. Looking at Defendant's annual reports between 2019 and 2024, Defendant earned an average annual return of 4.64% on its investments, which is 2.37% more per year than the Plan's earnings of 2.27% per year. *Supra* ¶ 43. Given the average Firstrust Cash Fund balance of $19.4 million during that time, *supra* ¶ 5454, Defendant has generated approximately $460,000 per year in income from the Plan's investment of employer contributions in the Firstrust Cash Fund, or $2,760,000 over the past six years.

65.     There is no participant-focused justification for Defendant's ongoing practice of diverting employer contributions to and profiting from the Firstrust Cash Fund. *Supra* at ¶¶ 4848– 59. Any benefit received by Defendant by virtue of this practice—however small—is contrary to ERISA. *See Sec'y of Lab. v. Doyle*, No. 05-CV-2264, 2020 WL 6689808 (D.N.J. 2020) ("the use of plan assets for any purpose other than (1) to pay benefits; or (2) to pay reasonable expenses that are necessary to the administration of the plan constitutes a per se breach of the duty of loyalty."). This is particularly so given that the benefit to Defendant is not "contingent upon subsequent

---

[17] Although Regulation D's limitation on savings account withdrawals was lifted during the coronavirus pandemic to provide consumers with greater access to their money, Firstrust still enforces these limits for frequent withdrawals. *See* Retail Account Agreement, Funds Availability & Electronic Funds Transfer Agreement and Disclosure, Firstrust Bank, https://file.firstrust.com/agreements/retail-account-agreement-and-disclosures.pdf (Firstrust "may refuse any request by you to withdraw or transfer funds from your Account if . . . it exceeds any limit on the frequency of withdrawals or transfers that we establish.").

decisions by other actors[,]" *Bloom v. AllianceBernstein L.P.*, 725 F. Supp. 3d 325, 337 (S.D.N.Y. 2024), but is instead the result of actions taken directly by Defendant. Accordingly, Defendant's actions violate ERISA's duty of loyalty. *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013).

### *Losses to the Plan*

66.    Defendant's overweighting of participant accounts to the Firstrust Cash Fund has had predictable results. A simple comparison of the Firstrust Cash Fund's performance versus the Plan's own target-date fund series—which serves as the default investment option for employee contributions—and the consensus target-date allocation as provided by the Callan Target Date Index illustrates the extent to which Defendant's conduct harmed participants.

|  | 2020-2024 Annualized Return |
|---|---|
| T. Rowe Price Retirement 2010 | 5.00% |
| T. Rowe Price Retirement 2015 | 5.41% |
| T. Rowe Price Retirement 2020 | 5.73% |
| T. Rowe Price Retirement 2025 | 6.34% |
| T. Rowe Price Retirement 2030 | 7.06% |
| T. Rowe Price Retirement 2035 | 7.86% |
| T. Rowe Price Retirement 2040 | 8.56% |
| T. Rowe Price Retirement 2045 | 9.07% |
| T. Rowe Price Retirement 2050 | 9.19% |
| T. Rowe Price Retirement 2055 | 9.16% |
| T. Rowe Price Retirement 2060 | 9.15% |
| **T. Rowe Price Retirement Plan-Weighted Average**[18] | **7.56%** |
| Callan Target Date Index 2010 | 4.23% |

---

[18] The T. Rowe Price Retirement Plan-Weighted Average return is determined by first calculating the average balance of each T. Rowe Price target-date fund vintage (*i.e.*, 2010, 2015, 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055, 2060, and 2065) within the Plan for each year 2020-2024, the last year for which Plan balance data is available. While five-year return data as of 2024 is not available for the T. Rowe Price Retirement 2065 fund—and thus is excluded from the table above—the balances and returns for this fund are included within the Plan-Weighted Average return given its incorporation of annual, not five-year, return data. The annual return for each target-date fund vintage is then assigned a weight based on that fund's relative balance in the Plan versus the other target-date funds. The sum of each fund's annual weighted average return produces the total Plan-Weighted Average Return for that year. The weighted average returns for each year are then annualized to produce the 2020-2024 T. Rowe Price Retirement Plan-Weighted Average return. This metric reflects the actual asset allocation—and corresponding participant demographics—of the Plan, providing a more precise illustration of the returns achieved but-for Defendant's conduct.

| | |
|---|---|
| Callan Target Date Index 2015 | 4.48% |
| Callan Target Date Index 2020 | 4.90% |
| Callan Target Date Index 2025 | 5.65% |
| Callan Target Date Index 2030 | 8.19% |
| Callan Target Date Index 2035 | 7.53% |
| Callan Target Date Index 2040 | 8.31% |
| Callan Target Date Index 2045 | 8.86% |
| Callan Target Date Index 2050 | 9.14% |
| Callan Target Date Index 2055 | 9.26% |
| Callan Target Date Index 2060 | 9.32% |
| Callan Target Date Index 2065 | 9.33% |
| **Callan Target Date Index All Vintages** | **9.22%** |
| **Firstrust Cash Fund** | **2.27%** |

67.     As shown, the Firstrust Cash Fund underperformed the weighted average return of the Plan's T. Rowe Price target-date funds by approximately 5.3 percentage points *per year* and the Callan Target Date Index by approximately 7.0 percentage points *per year* from 2020 through 2024. That is, had Defendant prudently invested employer contributions within the Plan's T. Rowe Price target-date funds, participants would have achieved, on average, returns approximately *233% higher per year* than the Firstrust Cash Fund. Indeed, all vintages of both the T. Rowe Price target-date funds and Callan Target Date Index—representing the complete risk spectrum for retirement investors—significantly outperformed the Firstrust Cash Fund. That is, the demographic makeup and risk tolerance of Plan participants is not to blame for this underperformance.

68.     A prudent and loyal fiduciary properly monitoring the Plan's investment in the Firstrust Cash Fund would have been aware of this entirely predictable result, as evidenced by historical risks and returns of asset classes. The full range of asset classes, including the Plan's T. Rowe Price target-date series, was available for Defendant to select for investment of employer contribution assets. Instead, Defendant prioritized profits over the retirement security of the Plan's participants in breach of its fiduciary duties.

**PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE**

69.     Until shortly before filing this action, Plaintiff lacked knowledge of material information to support his claims. Among other things, he lacked knowledge of the asset allocations and earnings of typical 401(k) plans relative to the Plan and the industry consensus asset allocation for their accounts as a whole. He also lacked actual knowledge of Defendant's process for monitoring the Plan, which is known only to Defendant prior to discovery. Plaintiff's allegations are based on inferences drawn from the facts adduced to date and are made upon information and belief in reliance on the investigation of counsel.

**PLAN-WIDE RELIEF**

70.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

71.     Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)-(3).

72.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interests are aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his abilities to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

**CLASS ACTION ALLEGATIONS**

73.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

74.     Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Firstrust 401(k) and Profit Sharing Plan since the date that is six years prior to the filing of this action.

75.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had hundreds of participants during the relevant period.

76.     <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and Plaintiff suffered injuries as a result of Defendant's violations of ERISA. Defendant treated Plaintiff consistently with other Class members with regard to the Plan. Defendant's improper actions affected all Plan participants similarly.

77.     <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

78.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

   a.     Whether Defendant was a fiduciary with respect to the Plan and the scope of its fiduciary duties;

   b.     Whether Defendant failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

   c.     Whether Defendant invested Plan assets for the benefit the company, a party in interest to the Plan, in violation of 29 U.S.C. § 1106(a);

   d.     The proper form of equitable and injunctive relief; and

20

e.  The proper measure of monetary relief.

79.  Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendant would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant.

80.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

81.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

82.     Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I
### 29 U.S.C. § 1104(a)(1)

83.     Plaintiff incorporates the foregoing paragraphs by reference.

84.     Defendant is the Plan fiduciary with discretion concerning how the employer contribution Plan assets are invested.

85.     Defendant violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by failing to prudently invest the employer contribution Plan assets in a manner consistent with the investment objectives of the Plan and its participants, and by allowing company interests to dictate its investment strategy.

86.     Defendant violated ERISA by failing to monitor the Plan's Firstrust Cash Fund on an ongoing basis. *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015) ("the duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]").

87.     Defendant's violations of 29 U.S.C. § 1104(a)(1) caused the Plan injury in the form of lost investment earnings, and Defendant's deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect participants' Plan accounts.

88.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendant's violations of 29 U.S.C. § 1104(a)(1) and other equitable and injunctive relief.

## COUNT II
### 29 U.S.C. §§ 1106(a) and 1106(b)(1)

89.     Plaintiff incorporates the foregoing paragraphs by reference.

90.    Defendant is the Plan fiduciary with discretion concerning how the employer contribution Plan assets are invested.

91.    Defendant is a "party in interest" to the Plan pursuant to 29 U.S.C. § 1002(14)(A) and (C) because it is the Plan administrator and fiduciary and its employees are the Plan's participants.

92.    Defendant violated 29 U.S.C. §§ 1106(a)(1)(D) and 1106(b)(1) by using employer contribution Plan funds for its own benefit by depositing Plan assets into the Firstrust Cash Fund for the purpose of profiting from participants' assets and reducing Firstrust's withdrawal risks.

93.    Each purchase of a certificate of deposit or addition to a savings account within the Firstrust Cash Fund constitutes a separate transaction under 29 U.S.C. § 1106.

94.    Defendant's violations of 29 U.S.C. §§ 1106(a) and 1106(b)(1) caused the Plan injury in the form of lost investment earnings, and Defendant's deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect participants' Plan accounts.

95.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. §§ 1106(a) and 1106(b) and other equitable and injunctive relief.

**PRAYER FOR RELIEF**

96.    Wherefore, Plaintiff prays for judgment against Defendant and for the following relief:

A.    Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as class representative, and certify his counsel as class counsel;

C.    Order Defendant to make good to the Plan all losses resulting from its violations of ERISA;

D.    Impose equitable and injunctive relief sufficient to protect Plan participants, including changes to Defendant's investment process and/or appointment of independent investment advisors and managers;

E.    Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

F.    Award prejudgment and post-judgment interest; and

G.    Award such other and further relief as the Court deems just and equitable.

Respectfully submitted,

Dated: November 21, 2025

**BERGER MONTAGUE PC**

/s/*Y. Michael Twersky*
Y. Michael Twersky
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-4656
mitwersky@bm.net

John G. Albanese*
**BERGER MONTAGUE PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
jalbanese@bm.net

**ENGSTROM LEE LLC**
Carl F. Engstrom, MN Bar No. 0396298*
Steven J. Eiden, MN Bar No. 0402656*
Melissa A. Carrington, Iowa Bar No. 13033*
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
cengstrom@engstromlee.com
seiden@engstromlee.com

**Pro Hac Vice* Motion forthcoming

**ATTORNEYS FOR PLAINTIFF**